## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| AMERICAN CREDIT ACCEPTANCE, LLC, 961 E. Main Street, 2nd Floor Spartanburg, South Carolina 29302 : : : : : | |
| Plaintiff, : | Civil Action No. __7:13-cv-80(HL)__ |
| v. : | |
| : | |
| DRIVE ACCEPTANCE CORPORATION PO BOX 3127 Moultrie, GA 31776 : : : : | |
| : | |
| GEORGIA CAR CREDIT, INC. 701 GA Highway 133 South Moultrie, GA 31788 : : : | |
| : | |
| JERRY LEE FRAZIER, JR. 701 GA Highway 133 South Moultrie, GA 31788 : : : | |
| : | |
| JLF HOLDINGS, INC. 701 GA Highway 133 South Moultrie, GA 31788 : : : | |
| : | |
| Defendants. : | |
| : | |

## COMPLAINT AND PETITION FOR INJUNCTIVE RELIEF

Plaintiff American Credit Acceptance, LLC ("ACA"), through its

undersigned counsel, for its Complaint and Petition against Defendants, avers as

follows:

## SUMMARY AND NATURE OF THE ACTION

1.      This is an action against Drive Acceptance Corporation, Georgia Car Credit, Inc., Jerry Lee Frazier, Jr. and JLF Holdings, Inc. (collectively "Defendants") for violations of Georgia's Uniform Deceptive Trade Practices Act, breaches of certain contracts, interference with business relationships and contracts and fraud and seeking temporary and permanent injunctive relief against Defendants.

## JURISDICTION AND VENUE

2.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  As set forth below, Plaintiff is a South Carolina limited liability company with its principal place of business in South Carolina.  Defendants Drive Acceptance Corporation, Georgia Car Credit, Inc. and JLF Holdings, Inc. are Georgia corporations with principal places of business in Georgia.  Defendant Jerry Lee Frazier, Jr. is a resident of Georgia.  The amount in controversy exceeds $250,000.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all Defendants reside in this district.

## PARTIES

4.      Plaintiff ACA is a South Carolina limited liability company with its principal place of business in South Carolina.  Through its business unit, Spartan Financial Partners, ACA is engaged in the business of commercial lending.

5.      Defendant Georgia Car Credit ("GCC") is a Georgia corporation with its registered office address at 701 GA Highway 133 South, Moultrie, Georgia 31776.  GCC engages in "buy here, pay here" automobile financing wherein it lends money to finance the purchase of automobiles.  In return for those loans, the consumers grant a lien on the purchased automobiles.  Those transactions are memorialized in written contracts between GCC and the consumer called retail installment sales contracts.

6.      Defendant Drive Acceptance Corporation ("Drive") is a Georgia corporation with its registered office address at PO BOX 3127 Moultrie, Georgia 31776.  Drive purchases executed retail installment sales contracts from GCC.

7.      Defendant JLF Holdings, Inc. ("JLF") is a Georgia corporation with its registered office address at 701 GA Highway 133 South, Moultrie, Georgia 31776.

8.      Defendant Jerry Lee Frazier Jr. ("Frazier Jr.") is a citizen of Georgia.

## FACTUAL BACKGROUND

9.      On November 21, 2011, ACA and Drive entered into a Funding Agreement (the "Funding Agreement") whereby Drive borrowed money from ACA (the "Loan") for use in financing the purchase of retail installment sales contracts.

3

10.     The Funding Agreement was amended and restated on March 28, 2012 through an Amended and Restated Funding Agreement ("Amended Funding Agreement").

11.     The Amended Funding Agreement was amended on June 14, 2012, August 10, 2012, October 31, 2012, November 15, 2012 and December 20, 2012.

12.     Drive also executed and delivered to ACA Promissory Notes ("Notes") securing repayment of the Loan.

13.     The collateral for the Loan included, but was not limited to: (1) the retail installment sales contracts between Drive and/or GCC and consumers; (2) the retail installment sales contracts assigned to or purchased by Drive; (3) the rights to and interests in the automobiles financed through the proceeds of the Loan as memorialized by the retail installment sales contracts; and (4) all of the related receivables.

14.     GCC and Frazier Jr. each absolutely and unconditionally, jointly and severally executed a guaranty of repayment of the Loan.

15.     ACA continues to own and hold the Notes, Guaranties, Funding Agreement, Amended Funding Agreement and related amendments.

16.     ACA guaranteed the value of its collateral by specifying certain conditions for the retail installment sales contracts and automobiles under the terms of the Funding Agreement and Amended Funding Agreement and requirements

and obligations for Drive including, *inter alia*, setting required minimum values for Drive's tangible net worth, interest coverage ratio and working capital and setting required maximum limits for Drive's leverage ratio.

17.     As part of their regular business practice and as part of a workout plan discussed below, ACA and Drive entered into a number of Receivables Purchase Agreements through which Drive transferred all of its rights and interests in certain retail installment sales contracts and/or installment loan and security agreements purchased with the Loan (the "RISCs") and all rights to and interest in the automobiles securing the RISCs (the "Automobiles").

18.     As part of the process of entering into the Receivables Purchase Agreements, GCC assigned to Drive all of its rights, titles and interests in and to the RISCs and all rights to and interests in the Automobiles to the extent not already assigned.

19.     On November 21, 2012, in the regular course of business, Drive and ACA entered into a Receivables Purchase Agreement through which Drive sold, transferred, assigned and conveyed to ACA all rights, titles and interests in and to 551 RISCs, including, but not limited to, all amounts due and all rights arising under those RISCs and all rights to and interests in the Automobiles securing those RISCs.

20.     On December 4, 2012, in the regular course of business, Drive and ACA entered into a First Amendment to Receivables Purchase Agreement amending the November 21, 2012 Receivables Purchase Agreement through which Drive sold, transferred, assigned and conveyed to ACA all rights, titles and interests in and to another 12 RISCs, including, but not limited to, all amounts due and all rights arising under those RISCs and all rights to and interests in the Automobiles securing those RISCs.

21.     Over the course of their relationship, Drive allowed its tangible net worth, interest coverage ratio and working capital to drop below a required set value and allowed its leverage ratio to rise above a required set limit, each of which constituted independent default and termination events under the Notes, Funding Agreement, Amended Funding Agreement and related amendments.

22.     In or around January 2013, ACA learned that Drive and GCC went into default with their floor plan lender, which resulted in Drive further defaulting on the Notes, Funding Agreement, Amended Funding Agreement and related amendments and Defendants defaulting on the Guarantees.

23.     In or around January 2013, Defendants and ACA negotiated a workout plan through which Defendants could attempt to resolve Drive's default.

24.     On January 4, 2013, as part of that workout plan, Drive and ACA entered into a Receivables Purchase Agreement through which Drive sold,

transferred, assigned and conveyed to ACA all rights, titles and interests in and to 1,425 RISCs and all rights to and interests in the Automobiles securing those RISCs.

25.     GCC, JLF and Frazier Jr. each executed the January 4, 2013 Receivables Purchase Agreement as guarantors, personally guaranteeing performance by Drive and obligating GCC, JLF and Frazier Jr. to pay or reimburse ACA for all costs, expenses and attorneys' fees paid or incurred in endeavoring to enforce Drive's performance.

26.     On January 11, 2013, in the regular course of business, Drive and ACA entered into a third Receivables Purchase Agreement through which Drive sold, transferred, assigned and conveyed to ACA all rights, titles and interests in and to another 25 RISCs, including, but not limited to, all amounts due and all rights arising under those RISCs and all rights to and interests in the Automobiles securing those RISCs.

27.     On January 22, 2013, in the regular course of business, Drive and ACA entered into a First Amendment to Receivables Purchase Agreement amending the January 11, 2013 Receivables Purchase Agreement through which Drive sold, transferred, assigned and conveyed to ACA all rights, titles and interests in and to another 6 RISCs, including, but not limited to, all amounts due

and all rights arising under those RISCs and all rights to and interests in the Automobiles securing those RISCs.

28.     On May 14, 2013, in the regular course of business, Drive and ACA entered into a Second Amendment to Receivables Purchase Agreement further amending the January 11, 2013 Receivables Purchase Agreement through which Drive sold, transferred, assigned and conveyed to ACA all rights, titles and interests in and to another 4 RISCs, including, but not limited to, all amounts due and all rights arising under those RISCs and all rights to and interests in the Automobiles securing those RISCs.

29.     As a result of the Receivables Purchase Agreements, Defendants transferred and assigned to ACA all rights and interests they had in the RISCs and Automobiles, including the right to collect or demand payments under the RISCs and repossess or sell the Automobiles.

30.     The Receivables Purchase Agreements also obligated Drive to, *inter alia*, remit to ACA any and all payments received related to the RISCs or Automobiles.

31.     Defendants represented that each RISC was an actual and performing account.

32.     ACA has determined that over 100 of the RISCs purportedly sold, transferred, assigned and conveyed to ACA were "ghost" or "phantom" accounts

that had no associated retail installment sales contract executed by a consumer, no associated payments or payment obligations and no security interest in any automobile.

33.    After entering into the Receivables Purchase Agreements, Defendants instructed over 200 ACA consumer clients to make payments under RISCs to Defendants instead of ACA and/or failed to instruct over 200 ACA consumer clients to make payments under the RISCs to ACA.

34.    When it did not receive payments, ACA contacted those consumer clients and was informed that the consumer client was making payments under his or her RISC to Defendants.

35.    Defendants have not remitted or forwarded those payments to ACA.

36.    On over 300 occasions, ACA applied non-cash credits to the accounts associated with the RISCs as an accommodation to those consumer clients and in an effort to improve the consumer client relationship.

37.    On some occasions those consumer clients lodged complaints with and/or against ACA.

38.    After entering into the Receivables Purchase Agreements, Defendants repossessed at least 3 Automobiles as a result of those consumer clients refusing and/or failing to make payments to Defendants without the consent, permission or

knowledge of ACA and despite having sold their interest in those Automobiles and related RISCs to ACA.

39.     After entering into the Receivables Purchase Agreements, Defendants sold at auction some of the Automobiles that were in their possession at the time that they entered into the Receivables Purchase Agreements without the consent, permission or knowledge of ACA and despite having sold their interest in those Automobiles to ACA.

40.     After entering into the Receivables Purchase Agreements, Defendants have resold to consumers at least 19 of the Automobiles that were in their possession at the time that they entered into the Receivables Purchase Agreements to new consumer clients without the consent, permission or knowledge of ACA and despite having sold their interest in those Automobiles to ACA.

41.     Drive did not remit any monies to ACA for the sale of those Automobiles.

42.     Drive's conduct constitutes default under the Notes, Funding Agreement, Amended Funding Agreement, related amendments and Receivables Purchase Agreements.  The conduct of GCC, JLF and Frazier Jr. constitute default under their Guaranties.  Those defaults remain uncured and all conditions precedent have been met.

43.    The aforementioned conduct also constitutes violations of Georgia's Uniform Deceptive Trade Practices Act, breaches of contract, intentional and negligent interference with contractual relationships and fraud.

44.    ACA has suffered irreparable injury that is not compensable by monetary damages.  Specifically, among other things, Defendants have negatively impacted and continue to negatively impact ACA's relationships with its consumer clients and potential consumer client base and have caused consumer complaints to be made to and about ACA.

## COUNT I – VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

45.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

46.    ACA and Defendants are persons as defined by Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-371.

47.    Defendants misrepresented the nature and status of the RISCs, Automobiles and associated accounts to ACA at the time they entered into the Receivables Purchase Agreements.

48.    Drive represented and all Defendants guaranteed that all of the RISCs and Automobiles and all rights and interests in the RISCs and Automobiles were being assigned and sold to ACA.

49.     Drive represented and all Defendants guaranteed that all of the RISCs and associated accounts were performing.

50.     Drive represented and all Defendants guaranteed that all of the RISCs and Automobiles existed and were actual accounts.

51.     Over 100 of the RISCs purportedly sold, transferred, assigned and conveyed to ACA were "ghost" or "phantom" accounts that had no associated retail installment sales contract executed by a consumer, no associated payments or payment obligations and no security interest in any automobile.

52.     After entering into the Receivables Purchase Agreements, Defendants retained rights in or acted consistent with the retention of rights in over 200 RISCs by, *inter alia*, instructing consumer clients to make payments under the RISCs to Defendants instead of ACA, accepting payments under the RISCs from consumer clients and/or failing to instruct consumer clients to make payments under the RISCs to ACA.

53.     After entering into the Receivables Purchase Agreements, Defendants retained rights in or acted consistent with the retention of rights in RISCs and Automobiles by, *inter alia*, repossessing Automobiles.

54.     After entering into the Receivables Purchase Agreements, Defendants retained rights in or acted consistent with the retention of rights in RISCs and Automobiles by, *inter alia*, selling the Automobiles at auction or to consumers.

55.     Defendants' aforementioned conduct and related representations constitute deceptive trade practices under O.C.G.A. § 10-1-3722.

56.     Defendants' aforementioned conduct has caused damage to ACA including, but not limited to, negatively impacting ACA's relationships with its consumer clients and potential consumer client base.

57.     As a result of Defendants' violation of Georgia's Uniform Deceptive Trade Practices Act, ACA is entitled to an injunction and costs and fees.

## COUNT II – BREACH OF CONTRACT

58.     All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

59.     Drive defaulted on the Notes, Funding Agreement, Amended Funding Agreement and related amendments by allowing its tangible net worth, interest coverage ratio and working capital to drop below a required set value and allowing its leverage ratio rise above a required set limit.

60.     Drive further defaulted on the Notes, Funding Agreement, Amended Funding Agreement and related amendments by defaulting on its loan with its floor plan lender.

61.     Defendants defaulted on their Guarantees by, *inter alia*, failing to remedy those defaults.

62.     Drive further defaulted on the Notes, Funding Agreement, Amended Funding Agreement, related amendments and Receivables Purchase Agreements and Defendants further defaulted on their Guarantees by, *inter alia*, selling RISCs and Automobiles that did not exist and/or that were not associated with actual accounts or consumer clients.

63.     Drive further defaulted on the Notes, Funding Agreement, Amended Funding Agreement, related amendments and Receivables Purchase Agreements and Defendants further defaulted on their Guarantees by, *inter alia*, contacting consumer clients associated with RISCs and Automobiles, accepting payments from consumer clients associated with RISCs and Automobiles and not remitting those payments to ACA, failing to instruct consumer clients associated with RISCs and Automobiles to make payments to ACA, repossessing Automobiles and selling Automobiles.

64.     Upon information and belief, the Defendants also defaulted on the Notes, Funding Agreement, Amended Funding Agreement, related amendments, Receivables Purchase Agreements and Guarantees in numerous other ways which shall be further determined as this case progresses.

65.     As a result of Defendants' breaches, ACA is entitled to judgment against the Defendants, jointly and severally, and to payment of accrued interest, costs and attorney's fees.

## COUNT III – FRAUD

66.     All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

67.     Prior to execution of the Receivables Purchase Agreements the Defendants misrepresented to ACA, *inter alia*, the status of the RISCs and the status of the Automobiles.

68.     Drive represented and all Defendants guaranteed that all of the RISCs and Automobiles and all rights and interests in the RISCs and Automobiles were being assigned and sold to ACA.

69.     Drive represented and all Defendants guaranteed that all of the RISCs and associated accounts were performing.

70.     Drive represented and all Defendants guaranteed that all of the RISCs and Automobiles existed and were actual accounts.

71.     Over 100 of the RISCs purportedly sold, transferred, assigned and conveyed to ACA were "ghost" or "phantom" accounts that had no associated retail installment sales contract executed by a consumer, no associated payments or payment obligations and no security interest in any automobile.

72.     The Defendants misrepresented that information with the intent to deceive ACA.

73.     Those misrepresentations were material to the Receivables Purchase Agreements.

74.     The Defendants misrepresented that information to ACA with the intent of ACA relying on those misrepresentations and with the desire to continue receiving payments and/or enforcing RISCs to the detriment of ACA.

75.     ACA reasonably relied on those misrepresentations to its detriment.

76.     ACA entered into the Receivables Purchase Agreements as a result of those misrepresentations.

77.     ACA's reasonable reliance on these misrepresentations by Defendants have reduced the value of the RISCs and Automobiles, causing ACA to suffer damages and injury.

78.     Furthermore, had ACA known that Defendants had made the aforementioned misrepresentations and/or would continue to act consistent with the retention of the rights and interests conveyed in the Receivables Purchase Agreement including, among other things, collecting payments associated with the RISCs and repossessing and selling Automobiles, it would have accelerated the balance due on the Loan as opposed to entering into the Receivables Purchase Agreements with Defendants.

79.     Accordingly, ACA's reasonable reliance on these misrepresentations by Defendants caused ACA to suffer damages and injury by, *inter alia*, not calling the Loan due.

80.     As a result of Defendants' fraud, ACA is entitled to judgment against the Defendants, jointly and severally, and to monetary damages, costs and attorney's fees.

## COUNT IV – INTERFERENCE WITH BUSINESS RELATIONSHIP AND CONTRACT

81.     All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

82.     Between November 21, 2012 and May 14, 2013, Drive and ACA entered into a series of Receivables Purchase Agreements whereby Defendants transferred, assigned, and conveyed to ACA all of its rights, titles and interests in the RISCs and Automobiles.

83.     As a result of the Receivables Purchase Agreements, Defendants no longer had a financial interest in the RISCs or the Automobiles and no longer had any business relationship with the consumer clients associated with the RISCs.

84.     Furthermore, as a result of the Receivables Purchase Agreements, ACA entered into a business relationship with the consumer clients associated with the RISCs.

85.    Defendants interfered with those relationships by instructing the consumer clients to make payments to Defendants, accepting payments from the consumer clients and/or failing to instruct the consumer clients to make payments to ACA, repossessing Automobiles and selling Automobiles.

86.    Defendants acted solely out of malice and for the sole purpose of harming ACA and/or used dishonest, unfair and improper means to interfere with ACA's business relationships.

87.    Defendants' conduct resulted in consumer clients breaching their agreements with ACA without justification by, among other things, failing to make payments to ACA.

88.    Defendants' interference caused harm to ACA's business relationships and resulted in, among other things, consumer client complaints to and about ACA.

89.    As a result of Defendants' interference with business relationships and contracts, ACA is entitled to an injunction against future misconduct, judgment against the Defendants, jointly and severally, and to monetary damages, costs and attorney's fees.

## COUNT V – TEMPORARY RESTRAINING ORDER

90.     All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

91.     ACA is substantially likely to prevail on the merits of its claims.

92.     ACA has suffered and will continue to suffer irreparable injury unless the temporary restraining order is issued.

93.     Defendants have negatively impacted and continue to negatively impact ACA's relationships with its consumer clients.

94.     ACA's threatened injury outweighs the damage that the proposed temporary restraining order may cause Defendants.

95.     This is particularly true because the actions ACA seeks to enjoin are associated with rights that Defendants already transferred and assigned or agreed to transfer or assign to ACA and/or are otherwise improper.

96.     Issuing a temporary restraining order in this matter would not be adverse to the public interest, but rather would benefit the public by demonstrating that contracts entered into between willing parties are enforceable and by stopping improper conduct and activity associated with consumers.

97.     Given the foregoing, ACA is entitled to an injunction against future misconduct.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, ACA prays for a judgment against Defendants as follows:

(a)   granting ACA judgment against Defendants, jointly and severally, for actual damages, plus interest from the date of this filing at the rate specific, costs of court, and reasonable and necessary attorney's fees;

(b)   preliminarily and permanently enjoining Defendants and all those acting in concert with them from contacting any consumer clients associated with any RISCs or Automobiles, collecting payments associated with any RISCs or Automobiles, collecting on any RISCS, repossessing or selling any Automobiles or engaging in any other conduct with respect to the RISCs or Automobiles; and

(c)   awarding ACA such other and further relief as this Court may deem just and proper.

Dated: June 11, 2013                    Respectfully submitted,

*/s/ Stefanie H. Jackman*
Christopher J. Willis, GA Bar No. 766297
willisc@ballardspahr.com
Stefanie H. Jackman, GA Bar No. 335652
jackmans@ballardspahr.com
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Facsimile: (678) 420-9301
*Attorneys for Plaintiff*
*American Credit Acceptance, LLC*